UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
BRENDA A. BEACHER,

        Plaintiff,

  - against -

THE ESTATE OF FRED M. BEACHER,

        Defendant.
-----------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
CV 05-1625 (ADS)

**A P P E A R A N C E S:**

    JOSEPH J. HASPEL, ESQ.
        Attorney for the Plaintiff
        40 Matthews Street, Suite 301
        Goshen, New York 10924

    HOPKINS & KOPILOW, ESQS.
        Attorneys for the Defendant
        100 Quentin Roosevelt Blvd., Suite 506
        Garden City, New York 11530
    BY:  Michael T. Hopkins, Esq.,
        of Counsel

**SPATT, District Judge.**

In this case, the plaintiff Brenda A. Beacher ("Brenda" or the "plaintiff") initially

presented a cause of action for a constructive trust with regard to the ownership of shares in a

corporation, called the B.B.E. Realty Corp. ("BBE"). In fact, the complaint in this action sets

forth only one cause of action against the defendant, the Estate of Fred M. Beacher, based on a

constructive trust. However, in his Post-Trial Memorandum of Law, plaintiff's counsel now

seeks "a judicial declaration that she is the owner of fifty percent of the shares of the stock in the

corporation known as B.B.E. Realty Corporation." (Plaintiff's Post-Trial Memorandum at 1).

Stated otherwise, in addition to the cause of action based on a constructive trust, the plaintiff seeks to amend her complaint to add a cause of action seeking "a declaratory judgment declaring that Brenda had never transferred her shares (of BBE), and that she continues to hold the shares she has held since 1991." (Plaintiff's Post-Trial Memorandum at 3). This request is in the nature of a motion to amend the complaint to add a cause of action for a declaratory judgment in addition to the constructive trust cause.

## I. <u>BACKGROUND</u>

In 1986, the corporation involved, B.B.E. Realty Corp. was formed by Fred M. Beacher ("Fred" or "Fred Beacher"), Robert Beacher ("Robert" or "Robert Beacher") and Melvin Epstein. At the time of the formation of BBE, Fred Beacher, Robert Beacher and Melvin Epstein were apparently each owners of one-third (33 1/3%) of the stock of BBE. The Court uses the word apparently because, in this case, the shares of stock were never issued; there was no stockholders' agreement; no relevant corporate books; and the stock ownership was solely delineated in tax records. In early 1991 Robert Beacher transferred his shares of stock in BBE to his wife Brenda. Thereafter, BBE bought Epstein's interest in BBE, thereby, ostensibly, making Fred Beacher and Brenda Beacher each fifty percent (50%) owners of the stock in BBE. As stated above, with the exception of the purchase of the Epstein stock, all of the other transactions and events were without documents. The absence of any documents with regard to the ownership of the BBE stock is a significant fact in this case.

## A. <u>The Plaintiff's Contentions</u>

Commencing with BBE's fiscal 1993 tax year, Brenda's interest in the BBE stock was diminished on the BBE tax returns. Thereafter, from 1995 over the next nine years, solely as

reported in the BBE tax returns, Brenda's entire stock interest in BBE appeared to be transferred to Fred Beacher. These purported stock transfers from Brenda to Fred were without written agreements or other documentary proof between the parties and, apparently, without any consideration.

According to the plaintiff, notwithstanding the facts reported in the tax returns, Brenda never relinquished and was the owner of her fifty percent (50%) interest in the BBE stock. As stated, there were no agreements making any transfer of the stock by Brenda to Fred and no consideration was paid to her. However, after the death of Fred Beacher, his Estate and Harry Helfeld, as Executor of the Estate, have refused to acknowledge Brenda Beacher's right to her ownership interest of any stock in BBE.

## B. The Defendant's Contentions

The defendant, the Estate of Fred M. Beacher, contends that the plaintiff cannot prove all of the essential elements of a constructive trust; cannot now assert a declaratory judgment cause of action; and the doctrines of laches and unclean hands preclude any relief by the plaintiff. Initially, the defendant Estate contends that the plaintiff's motion to assert a declaratory judgment cause of action should be denied on the ground that the plaintiff should have raised this issue some five years ago. In addition, the defendant contends that where the plaintiff has interposed a request for a constructive trust "a declaratory judgment serves no useful purpose" and "would fly in the face of all that the declaratory judgment act seek to accomplish." (Defendant's Post-Trial Memorandum at 12).

In addition, with regard to the claim of constructive trust, the defendant contends that the plaintiff Brenda Beacher did not have a confidential relationship with the defendant's decedent.

Also, the defendant contends that no promises were made by the defendant's decedent to the plaintiff. In addition, the defendant contends that the defendant's decedent did not perpetrate any fraud involving the plaintiff.

Further, the defendant contends that the inequitable conduct of the plaintiff and the unreasonable delay in bringing this constructive trust action are sufficient to invoke the doctrines of "unclean hands" as well as "laches". Finally, the defendant also invokes the defenses of the six year statue of limitations under CPLR § 213(8) and the statute of frauds under New York General Obligation Law §§ 5-701 and 5-706.

## II. THE JUDGE PLATT DECISION

On September 18, 2008, Judge Thomas C. Platt rendered a decision on the defendant's motion for summary judgment seeking a dismissal of the plaintiff's constructive trust cause of action. In that decision, Judge Platt denied the defendant's motion for summary judgment and made the following statements and decisions:

(1)   No shares of stock were ever issued by BBE nor was there a shareholder's agreement.

(2)   In 1986, three BBE shareholders were reported as each possessing a one-third share on the BBE K-1, namely, Fred Beacher, Robert Beacher and Melvin Epstein.

(3)   In 1993, Robert Beacher filed for bankruptcy, which was discharged on October 24, 1995.

(4)   From 1995 to the date of the decision, the K-1s for BBE reflect that the decedent was the sole shareholder.

4

(5)      From 1986 until after the decedent's death in November 2004, neither Brenda nor Robert communicated with executor Helfeld with regard to the representations in the K-1s.

(6)      Both the plaintiff and Robert were aware that from 1995 through 2004, Fred acted as sole owner of BBE and paid all taxes connected with the enterprise.

(7)      There was no writing confirming a stock transfer from Brenda or Robert to the decedent, and Brenda, the plaintiff, disputes whether the stock was, in fact, transferred.

(8)      A confidential relationship existed between the plaintiff Brenda Beacher and the decedent Fred Beacher.

(9)      A promise to reconvey legal title to BBE stock may be implied by the circumstances surrounding the transfer.

(10)     In this case, there are no documents evidencing a transfer of BBE between decedent and plaintiff, nor has any proof of consideration for the transfer been offered.

(11)     As a result, a genuine triable issue of fact as to the circumstances surrounding the transfer of BBE, and whether the transfer was made in reliance upon an express or implied promise exists.

(12)     "[I]n the absence of any evidence of consideration for the transfer of all of BBE's shares into decedent's name alone, there is a question of fact as to whether decedent's estate will be unjustly enriched by the inclusion of BBE."

(13)     Another issue of material facts exists as to whether the plaintiff and her husband

received profits from BBE and paid no taxes on the income, leading to the
doctrine of "unclean hands".

Beacher v. Estate of Fred Beacher, No. 105, CV-1625 (TCP) (Sept. 18, 2008).

## III. THE TRIAL

### A. The Plaintiff's Case

Harry Helfeld is a public accountant and a practicing lawyer. He is familiar with the
B.B.E. Realty Corp., which is a real estate entity. Its principal asset is the building at 116-22
Metropolitan Ave. in Jamaica, New York, which has three tenants. The other asset of BBE is
cash in its bank account which consists of rental income, and a checking account. Helfeld
manages the BBE business and collects the rent. In addition, BBE has a money market account
with a broker with a minimal amount of $200 to $300 a year. BBE has no other source of
revenue. It is a single real estate corporation. Helfeld was the BBE accountant from 1986 when
BBE was formed, to the death of Fred Beacher on November 10, 2004. As the accountant, he
had access to the books and records of BBE.

Helfeld testified that the initial stockholders of BBE were Robert Beacher, Fred Beacher
and Melvin Epstein. Helfeld never prepared any financial statements for BBE, nor has he ever
seen such a financial statement. Also, he never participated in any stockholders' meetings of
BBE. In the beginning, he knew only one officer, Fred Beacher, "who signed all tax returns as
president." Tr. at 37.[*] He has never seen any other documents signed by any of the other
stockholders.

Helfeld "believes" that Brenda Beacher was the wife of Robert Beacher. In 1991, he was

---

[*]Tr. refers to the trial transcript.

told by Fred Beacher that Brenda was a stockholder.  Melvin Epstein had been a stockholder in

BBE.  On June 1, 1993, a "Stock Purchase Agreement" was executed for the sale of the stock of

Melvin Epstein to BBE.  (Pltf's Ex. 1).  The sale was for the sum of $15,000.  This agreement

was signed by Fred M. Beacher, Robert L. Beacher and Brenda Beacher.  Helfeld professed no

knowledge of this transaction.  He hasn't seen Robert or Brenda for years.

Helfeld has prepared Fred Beacher's income tax returns.  His office prepared Fred

Beacher's last will and testament which is dated April 30, 2003.  (Dft's Ex. A).  He reviewed the

contents of the will with Fred on two occasions.  Helfeld is named as executor in the will.  The

will of Fred Beacher refers to the BBE real property at issue in this case, as follows:

> My office building at 116-22 Metropolitan Avenue, Kew Gardens, NY
> shall also be placed in a trust for the benefit of my Son Jeffrey Beacher.  I ask that
> my executor and or Trustee allow my current associate, Dr. Leonard Rickman be
> allowed to practice there as long as he desires.  He currently pays $1,608.00 per
> month for said use.  Should he purchase or in any way acquire my practice, I
> desire the minimum rent to be $3,216.00 per month.  These decisions as to the
> sale of the building; sale of the practice and or amount of rental to charge shall be
> decided by my accountant, attorney and friend HARRY HELFELD who, if he
> feels necessary may consult with my brother Robert L. Beacher.
>
> The net proceeds (after all expenses and taxes) of the sale of the building
> and or practice shall be given to my Son Jeffrey Beacher in a trust.  I do not
> authorize the trustee to use any proceeds for the purchase of a new, used auto or
> rental of a chauffeur driven limo.
>
> Should the building where my office is located not be sold, then the rental
> proceeds shall be placed in this trust for Jeffrey and the building maintenance be
> paid from said trust.
>
> I ask that my trustee call my neighbor David Montrose on Metropolitan
> Avenue with a view to giving him a verbal first option to purchase said property
> on Metropolitan Avenue.

(Dft's Ex. A).

The Fred Beacher will contained no specific bequest with regard to the shares of BBE. In fact, there is no mention of BBE in the will. Helfeld never saw any deed to the BBE property. As the accountant of BBE from 1986 through 2004, it was his understanding that BBE was the owner of the real estate on Metropolitan Avenue in Queens. Helfeld also testified that that he never saw any contract or any other document regarding the sale of Brenda's share.

> Q. Have you ever seen any contract of sale for the conveyance of shares by Brenda Beacher to Fred Beacher?
>
> A. No, sir.
>
> Q. Have you ever seen any documents signed by Brenda Beacher or any agents of Brenda Beacher memorializing her acquiescence to the transfer of the shares of BBE to Fred Beacher?
>
> A. No, sir.
>
> Q. Have you ever seen any document which would indicate any consideration passing between Fred Beacher and Brenda Beacher for the shares of stock of BBE?
>
> A. No, sir.

Tr. at 55.

Helfeld explained what an S Corporation was. An S Corporation "is the same as a regular corporation . . . except that the income or loss is transferred to the individual shareholders in the . . . exact percentage of ownership." Tr. at 57. He also explained that a K-1 is a "squeal sheet. In a sense we're negotiating the government. They get the original return . . . a copy is given to the individual person and it is attached to the corporate return form 1120S." Tr. at 57. The K-1s were prepared by Helfeld and sent to the appropriate persons listed on the K-1. Neither Robert nor Brenda ever contacted him orally or by writing or by a telephone call. He never heard

from either of them stating that the K-1 information was incorrect.

As to the K-1 filed in 1994, as reported to the government, Brenda's interest in BBE was one-third. No one contacted him to say that the K-1 was in error. However, in 1993, Epstein sold his one-third share and Brenda apparently acquired a fifty percent (50%) interest in BBE so that the 1994 K-1 which reflected that she had a one-third interest was incorrect. Also, Helfeld testified that he never received any information that Robert Beacher or Brenda Beacher actually "reviewed" the BBE tax returns, nor did he ever discuss the returns with either or them.

Robert Beacher, the brother of the decedent, Fred Beacher, testified that he, his brother and Melvin Epstein formed BBE in 1986. In fact, the initials BBE, stand for Beacher, Beacher and Epstein. Each of the three partners contributed $25,000 to capitalize the BBE corporation. No stock certificates were issued, but each of the three investors owned one-third. In 1991, Robert transferred his shares in BBE to his wife Brenda. In 1993, Epstein sold his shares in BBE. A Stock Purchase Agreement was executed on June 1, 1993 (Pltf's Ex. 1), in which Epstein agreed to sell his one-third share of the common stock in BBE for the sum of $15,000. As stated in the Stock Purchase Agreement, the purchaser of the Epstein common stock was BBE.

Robert testified that Brenda did not participate in the operation of BBE, and, even after he transferred his shares to her, he acted as her agent. Fred died on November 10, 2004. Significantly, prior to his death, Robert never saw any document concerning the sale of Brenda's share. Nor did Brenda receive any return of capital or compensation of any kind from BBE or Fred. Only after Fred's death did Robert learn that Fred's estate claimed that Fred owned one hundred percent of the BBE shares. Robert first saw this alleged change of ownership in the K-1

tax returns. He never authorized Fred to transfer Brenda's shares "in any way". It was Robert's understanding that after Epstein sold his shares in BBE, it was to be a 50/50 partnership between Fred and Brenda. There was, apparently, a close relationship between Robert and Fred. Especially when Fred became ill, Robert communicated with his brother on a daily basis.

On cross-examination, Robert testified that there was a written agreement between himself, Robert and Epstein but he cannot locate a copy of that agreement. Robert testified that no share of stock of BBE were ever issued. Further, he stated that he did not review the BBE tax returns for the years 1987 through 2003, until after Fred's death. In 1991 he transferred his interest in BBE to his wife Brenda, but no documents were executed to indicate such a transfer. In fact, there were never any documents or any writing between him, Brenda and Fred, with regard to the stock ownership of BBE. The only written reference to such stock ownership were in the corporate K-1s. Also, the corporate records, with regard to stock ownership, were never filled out. The corporate books were blank.

Robert believed that Fred signed the BBE tax returns, because Fred solely ran this real estate business. According to Robert there were often errors in the tax returns. Robert noted that the 1991 tax return was incorrect in that he was named as a stockholder, when he had transferred his share of the corporate stock to Brenda. In 1994, the K-1indicated that Brenda's share was 33 1/3%. However, in 1993, BBE purchased Epstein's shares, so that his wife's interest became 50% and yet the return indicated 33 1/3%. Robert has no recollection of ever reporting any income or loss to Brenda attributable to BBE in any of their joint income tax returns. With regard to the subsequent K-1s which reflected that Fred had a 100% stock ownership, Robert had no explanation, except that he did not review these subsequent returns. Nor could he state

whether his own tax returns indicated a BBE stock ownership for Brenda. In that regard,

Robert's response was as follows:

| | |
|---|---|
| THE WITNESS: | I would like to answer your question. |
| | My tax returns for many, many years was about an inch or so thick. My accountants would give me the returns. I never bothered to thumb through the individual pages to see what was in it. My only concern was how much did I have to pay the government, and sign the check. |
| THE COURT: | Well, you know that that issue is an important one in this case, don't you? |
| THE WITNESS: | I recognize that there's an issue in this case of how my wife's stock disappeared. |
| THE COURT: | No, I didn't say that. I said to you: Do you understand? And if you don't, I'm telling you now that whether you reported income to Brenda or yourself from BBE during the years 1995 to 2003 is an important issue in this case. |
| | Do you understand that? |
| THE WITNESS: | I do right now. |
| THE COURT: | Did you ever look to see whether you reported that? |
| THE WITNESS: | No, I didn't. |

Tr. at 261.

A strange and disturbing event arose during Robert's cross-examination. A document

referred to as a will of Fred Beacher, was produced by the defendant. (Dft's Ex. B). The

document purported to be Fred Beacher's will. This document was dated November 1, 2004 and

was not signed by Fred Beacher. However, it was purportedly notarized by Patricia G. Martino

as of November 1, 2004 with the notary stamp affixed. This singular and unsettling circumstance

is described by counsel for the plaintiff in his "Post-Trial Memorandum of Law."

> Absent all the hyperbole, Defendant asks this Court to strip Brenda of her ownership rights because her husband participated in an abandoned attempt to have a substitute Last Will and Testament of Fred Beacher executed. The underlying facts being that Robert Beacher, together with Fred Beacher's children, Mindy and Jeffrey, and Fred Beacher's sister, Rosalind Abel, were considering offering a will wherein Fred Beacher's signature would be forged by Mindy (the "Unsigned Will"). After Mindy rescinded her willingness to forge her father's name, the Plan was aborted.

> A copy of the Unsigned Will was admitted into evidence as Exhibit B. No evidence was presented that Brenda was a participant in this abandoned act.

*　　*　　*　　*　　*

> The difference between the Unsigned Will and the Will admitted to probate was the person named as executor. It did not change any bequest. There was no bequest to Plaintiff or Robert Beacher. The testimony of Todd Nahins, Esq. indicated that the deceased requested this change before he died, and Mr. Nahins prepared the Unsigned Will at Fred Beacher's request. Tr. at 134-137.

(Plaintiff's Post-Trial Memorandum at 20, 21).

In response to the description of this so called substitute will by the attorney for the

plaintiff, the defendant's counsel responded in his "Post-Trial Memorandum of Law" as follows:

> On the same date as the death of Dr. Beacher, November 10, 2004, Mr. Robert Beacher: (a) accessed Dr. Fred M. Beacher's computer; (b) took the bogus Last Will & Testament prepared by Mr. Nahins (Exhibit "B"), purportedly in the name of Dr. Fred Beacher, to a notary public; (c) had the notary, who he had known for many years, and with whose husband he had a business interest, affix both her stamp, signature, and date to the bogus Last Will & Testament prepared by Mr. Nahins in order to make same appear to be genuine; (d) took same to his niece Mindy Nirenberg and recruited her to forge the name of her late father, Dr. Beacher. But for the fact that Mindy Nirenberg refused to sign, Mr. Robert Beacher was prepared to have other witnesses sign, their signatures notarized, and ultimately present the fraudulent Last Will & Testament to the Nassau County Surrogate's Court.

> As a result, the Estate was caused to incur expenses in its efforts to make sure the bogus Last Will & Testament (Exhibit "B") was not probated.

(Defendant's Post-Trial Memorandum at 10, 11).

Defendant's counsel also contends that, if this scheme had succeeded, Robert Beacher would be the executor of Fred's estate and he would have been in a position to approve Brenda's claim to 50% of the stock of BBE.  There is some justification to this theory.  Robert's explanation for this serious conduct was that Fred wanted this document signed and he was attempting to comply with his brother's wishes.  It seems that Robert had a power of attorney from Fred up to the date of his death.  However, Robert conceded that he signed his name "Robert Beacher" on half of twelve checks for his brother and he signed "Robert Beacher POA" on the other half.  Robert contends that the checks "were all for the bills of my brother".  To compound the questionable nature of Robert's conduct, he conceded that when Mindy refused to sign this "Will", he stated "that if she doesn't sign . . . I'll tie everything up for the next five years, and you'll get nothing."  Tr. at 303.

After Fred's death, Robert's questionable actions continued.  Acting as the president of BBE, he accessed "the cash that was in the BBE account".  Tr. at 307.  In November 1994 after Fred's death, he took $29,000 and change from the BBE bank account.  Robert's attorney, Joseph J. Haspel is now holding that money in escrow.  From 1986 until 2004, Robert asserts that he was the president of BBE.  However, in the only document referring to BBE, the agreement in which Epstein sold his stock, (Pltf's Ex. 2), Robert did not sign as president.

Although Robert Beacher admitted in his deposition that from 1995, in the tax returns sent to him, his brother Fred was reporting himself as the sole owner of BBE, at the trial he was evasive on this subject.  Robert testified that he just threw the data into a folder "in the pile and not even be concerned about it."  Tr. at 331.  From 1995 to 2003, he did not review the K-1 returns.  He threw them in a box or a drawer and did not review them.  Also, at his deposition

Robert testified that Helfeld changed the tax returns; took his wife off the returns and "made my brother the sole owner of it". On November 17, 2004, after Fred's death, he had a conversation with Jeffrey Beacher, Fred's son, in which Jeffrey said to Robert that "his father had bought the building from you". Tr. at 346, 347. Robert responded to that statement by denying it was true, accompanied by obscenities.

Robert explained that BBE owned a small office building located in Queens and that his role was limited to making financial contributions to make up shortfalls and also to do maintenance work on the building. He was not involved in the day to day operation of the building. His brother collected the rent and paid the bills. Again questioned about the BBE tax returns, Robert explained that "Fred would give me the returns, and I would, you know, generally put it into a file." Tr. at 369. While he did not review the returns from 1991 and 1992, he knew there was a mistake in that he was still referred to as a shareholder, when his share had been transferred to Brenda.

Robert was questioned about the K-1 for 1993, after the Epstein sale, when the K-1 stated that Fred had a 55% ownership interest, then a 66 2/3% interest and then a 100% ownership interest.

     Q.     That K-1 designated Fred Beacher as a 55 percent owner.

             Do you see that?

     A.     Yes, I do.

     Q.     When was the first time you saw that K-1 - -

     A.     After Fred - -

Q.      Excuse me.  When was the first time you saw that?

A.      After Fred's death.

Q.      Do you have any idea as to how that transaction occurred, to give Fred
Beacher an ownership interest of 55 percent?

A.      Not the slightest.

Q.      Now look at the next year, 1994.

        Do you see that?

A.      (Perusing) Yes.  I found the K-1 for 1994 for Fred Beacher.

                                *   *   *   *   *

Q.      Now, during the year 1994, are you aware of any sale or transfer of any owner's
interest in BBE to anyone?

A.      There were none.

Q.      Now, the K-1s for the 1994 year designate Fred Beacher as what percentage?

A.      66.667.

Q.      When was the first time you saw and reviewed this K-1?

        THE COURT:          Just one minute now.

        I see.  Okay.

A.      After Fred's death.

BY MR. HASPEL:

Q.      Do you have any idea as to how the ownership was changed or the thought
process to the ownership changed from the 1993, 55 percent, to the 1994, 66.667
percent?

A.      No idea whatsoever.

Tr. at 378, 379.

Significantly, Robert Beacher testified on several occasions that he first saw and received the 1995 K-1 only after Fred's death.

Q.    Now, let's continue with the 1995 tax return.

       Did you find the K-1s in those tax filings?

A.    Yes, I just found it.

Q.    And in the 1995 return, what is Fred Beacher's designated ownership of interest?

A.    One hundred percent.

                         *    *    *    *    *

Q.    Now, during 1995, are you aware of any sale or transfer of anyone's interest in BBE's shares?

A.    No, I'm not.

Q.    I'm not sure if I asked this.  When was the first time that you saw and reviewed the 1995 K-1?

A.    After Fred passed away.

Q.    Are you aware of how the - - or the reasoning behind the change in the number from 66.667 percent in 1994 to 100 percent in 1995?

A.    I have no idea.

Q.    Are you aware of how it got from 55 percent in 1993 to 100 percent in 1995?

A.    I have no idea.

Q.    Are you aware whether Brenda Beacher or anybody else on Brenda's behalf received any compensation in 1993 for the change from 50 percent to 55 percent?

A.    No.

Q.    Are you aware of any compensation - - and I want to go back to 1993.

Are you aware of any consideration whatsoever, whether it be monetary or otherwise?

A.    There has been none.

Q.    In 1994, are you aware of any consideration, monetary or otherwise, from the change of 55 percent to 66.667 percent?

A.    No.

Q.    The same question for 1995, where it went from 66.667 to 100 percent?

A.    No.

Tr. at 378-381.

With regard to the twelve checks on his brother's account signed by Robert, after Fred's death, "each and every one of the checks were to pay bills of my brother or to make the payroll at my brother's office" and "not one cent" was used on his behalf or on Brenda's behalf.  Tr. at 405.

Robert Beacher described a meeting in his brother's house, after his death, on November 17, 2004, when the family was finishing the shivah period.  At that meeting, for the first time, he heard his nephew Jeffrey Beacher say that he understood that the BBE building was owned by his father.  He had no "inkling whatsoever that Brenda somehow lost her ownership in BBE."  Tr. at 409.  Robert testified that over the years, he had made capital contributions of more than $41,000 to BBE but he had no checks to corroborate that statement.

Brenda Beacher testified that her husband Robert took care of all their business matters and managed her assets including her BBE shares.  She testified that she never consented to the transfer of her shares of BBE in her name; never contracted with anyone to sell her shares; and never received any money or other consideration with respect to her shares in BBE.  After Fred died, she turned this matter over to her husband to represent her.  Actually, Brenda Beacher, although the named plaintiff on this case, has very little knowledge or recollection of the events

in which she became the owner of her husband's shares of stock in BBE. As she stated, whatever her husband put in front of her to sign, she would do so without any questions. She trusts her husband "with all my heart." Tr. at 467. As to the November 17, 2004 meeting after Fred's death, she doesn't recall saying to Jeffrey Beacher "It's yours, all yours."

Jeffrey Goldstein is a self-employed CPA. Robert and Brenda Beacher were his clients from the late 1980s, when he initially prepared their business tax returns. Later in the 1990s, he also prepared their personal tax returns. Although Goldstein heard that Fred and Brenda were equal shareholders in BBE, he never included any interest in BBE on their tax returns.

Goldstein explained that a K-1 "is basically a statement by a corporation to the government of a shareholder's ownership in a subchapter S Corporation." Tr. at 519. He recalls seeing K-1s for Brenda Beacher in BBE. Asked to review the K-1s in court, he testified that a 1991 K-1 shows Brenda with a one-third interest. Also in 1992, the K-1 shows a "one-third" interest for Brenda and the 1994 K-1 shows a 33 and one-third percent interest. The 1995 K-1 shows a one hundred percent interest to Fred Beacher. However, in all the tax returns of Robert and Brenda from the latter part of the 1990s until 2003, he never included in their joint returns anything referable to BBE.

In August or September 2003, Robert asked Goldstein to contact his brother Fred, who told him that he was considering a change of accountants. At that time, Fred told Goldstein that BBE was owned by himself and Brenda. When he later heard of the legal dispute between Brenda and the Estate with regard to the ownership of BBE, he told Robert of the statement made to him by Fred more than a year before. Goldstein then asked Robert for copies of the K-1 as some evidence of his wife's ownership of BBE. Robert did not give him any copies of the K-1 or any of the evidence of Brenda's ownership in BBE.

With the conclusion of Goldstein's testimony, the plaintiff rested. At that time, the plaintiff's counsel moved to conform the pleading to the proof. In essence, however, the plaintiff moved to amend the complaint to add to the cause of action pleaded for a constructive trust, a "straight up" cause of action for a declaratory judgment, stating that there was never a transfer of the BBE stock from Brenda to Fred. As related by plaintiff's counsel:

| | |
|---|---|
| THE COURT: | That's an amendment during and after trial. What do you want to amend? |
| MR. HASPEL: | I would want amended - - as I said, I would want the amendment of the complaint to include a straight up action for a declaratory relief, which is effectively, in my opinion, part and parcel. It can be both part and parcel of constructive trust, and it may stand on its own. |
| | There is nothing new or different than I was arguing from day one. I believe just in order to complete the circle, the motion is appropriate in this case. |
| THE COURT: | I'm not sure what you are talking about. Are you saying you have proved or established another cause of action in addition to the constructive trust? |
| MR. HASPEL: | I'm saying alternatively - - |
| THE COURT: | What cause of action? |
| MR. HASPEL: | A cause of action seeking declaratory relief as to ownership. That's it. |
| | And as Judge Platt said, a constructive trust can extend to this particular set of facts. |
| | I'm not sure, again, that it's necessary to make this motion, but I think for the sake of completeness it is appropriate. |

Tr. at 561, 562.

At the conclusion of the plaintiff's case, the Court reserved decision on the plaintiff's motion to amend the complaint to add a cause of action for a declaratory judgment.

## B.  The Defendant's Case

Todd I. Nahins is an admitted attorney in the state of New York.  He was subpoenaed to appear.  He is an expert in the estate law field and is the brother of the plaintiff Brenda Beacher. Nahins prepared the unsigned will of Fred Beacher referred to in the previous testimony (Dft's Ex. B).  Nahins testified that he spoke to both Robert and Fred in a telephone conversation.  In that conversation Robert said "we want to make some changes."  Robert further said that "I'm going to send you over something.  All you need to do is retype it."  Tr. at 128.  By virtue of that conversation, Nahins received some paperwork from Robert or Fred.  He retyped the document, and it was the unsigned will in evidence.  (Dft's Ex. B).  In this unsigned will of Fred Beacher, his brother Robert was the named executor.  There came a time when Nahins learned that Fred Beacher died of cancer.  During the telephone conversation referred to above, Nahins knew that Fred was suffering from cancer.

On cross-examination, Nahins testified that Fred's words were cogent and clear.  Nahins stated that Fred was aware of the purpose of the telephone call; did not object to the words spoken by Robert; and made the request stated in the telephone call.  In fact, Nahins testified that he believes that Fred said, "do what my brother wants me to do."  Tr. at 143.  Also, apparently, Robert's activity in the BBE building was to have decreased under the provisions of the unsigned will.  There was never an attempt to probate the unsigned will.

The deposition of Patricia Martino was read at the trial.  She is employed as an administrative assistant in her husband's architect concern.  She has been a licensed notary public since 1980.  As a notary, it is important that she actually sees the person signing the document before she affixes her stamp or seal and signs as a notary.  At that juncture, the witness stated that she invoked her rights under the Fifth Amendment of the United States Constitution and refused

to answer the next question.

Martino did testify that she knew Brenda Beacher because her husband and Robert Beacher had a working relationship. Her husband did drawings for Fred Beacher's home. Fred never discussed with Martino or her husband his financial holdings or his property in Queens or his business relationship with Brenda and Robert or the BBE real estate.

Martino testified that although she lost her notary stamp once some ten years before, she never lost it again nor did she give it to anyone. She was shown the unsigned will. (Dft's Ex. B). She does not recall seeing it previously. She conceded that the document contained her signature and her notary stamp and then she again invoked her Fifth Amendment rights. She never talked to Brenda or Fred's children, Jeffrey and Mindy about the unsigned will.

Harry Helfeld was recalled in the defendant's case. He did legal and accounting work for Fred Beacher. He did accounting work for Fred on BBE starting with the year ending December 31, 1986. Fred wanted a will prepared. He mentioned to Helfeld that he had a building which is part of BBE Realty Corporation. In response to the Court's question, Helfeld explained what is a K-1, as follows:

THE WITNESS:    A K-1 is an information return . . . The K-1 form indicates the name of the corporation, the address, federal ID number, and then it also asks for the name of a shareholder, address, social security number, where the tax return was filed, in which area - - usually, normally, it is Holtsville. Now it is Cincinnati.

It also asks for a breakdown of the type of income - passive, ordinary income - and then a percentage of ownership.

*   *   *   *   *   *

THE COURT:    No, I'll allow it. Motion denied.

|  | I'm still trying to find out - - suppose I'm making out my personal tax return, and I own the shares in this corporation. Who would make out the K-1? |
|---|---|
| THE WITNESS: | The person who prepared the corporate return, the corporate tax return, would then send you a copy of that K-1 form showing you what your share of income or loss was. So that whoever prepared your return, whether you or someone else, would then use that information and place it on schedule E of your tax return. |
| THE COURT: | And this K-1 would show the percentage or number of shares? |
| THE WITNESS: | Either one. You could say one-third or 33.13 or whatever number is correct. |

Tr. at 620-622.

On the BBE tax returns, between 1986 and 2003, Fred Beacher signed the return as the tax managing partner. After Fred's death, Helfeld had a conversation with Robert, who told him that he had the combination of the safe in Fred's home and he turned over $9,000 in cash.

Helfeld also testified about a meeting with Fred in March or April 2003. They discussed Fred's will. Fred wanted Helfeld to be the "trustee for his son" and he wanted "control from the grave of his son" and Helfeld voiced his objection to these thoughts. Fred said that "I really don't trust my brother to the extent of handling what I want to be done." Tr. at 629. With regard to the BBE building; Fred said "I want my building to go to my son in trust." Tr. at 630. In his will, in evidence as Dft's Ex. A, Fred appointed Helfeld as his executor and trustee of any trust and, also, appointed his brother Robert as alternate executor and alternate trustee.

Helfeld related that in the mid-1980s, when the BBE tax returns were first created, there were three shareholders, Fred Beacher, Robert Beacher and Melvin Epstein. Each owned one-third of the shares of the corporation. When he asked Fred for some documentation as to this

22

stock ownership, Fred replied, "Take my word." Tr. at 645. Sometime after 1991, perhaps in 1992, Fred Beacher told him that "Brenda Beacher owned one-third rather than Robert Beacher." Tr. at 646. However, as was apparently their practice, there was no documentation supporting that transfer of stock to Brenda.

Helfeld further testified that no one communicated with him on the subject of the K-1s. He did have a further communication with Fred Beacher regarding a shareholder's interest. He produced a handwritten letter dated March 17, 1994, signed by Fred. (Dft's Ex. D). In that letter Fred enclosed certain tax returns and advised Helfeld that his partners were Brenda Beacher and Melvin Epstein. In this letter, Fred also advised Helfeld that "I bought Mel's 1/3 of 116-22 Met. Ave. Therefore, the business loss listed on the K-1 for Brenda and me is wrong. Please redo with the correct numbers." (Id.).

Helfeld explained that one of the tax returns went out in error in that it listed Fred Beacher with a 55% ownership. According to him, Fred's interest should be two-thirds because he, Fred, bought Epstein's one-third interest. Obviously, Helfeld carried out this decision because Fred wrote to him on March 17, 1994, stating that he, Fred bought Mel's 1/3 interest. However, the Stock Purchase Agreement in evidence (Pltf's Ex. 1), indicates that BBE bought Epstein's interest. If that is so, then, with reasonable certainty, both Fred and Brenda would obtain the benefit of that purchase. According to the express terms of the Stock Purchase Agreement, at that point, as of June 1, 1993, the date of the sale, Fred and Brenda each owned 50% of the stock of BBE. Notwithstanding this result, guided by Fred's letter that he purchased the shares, Helfeld amended the 1993 K-1 to reflect that Fred had a two-third interest and Brenda had a one-third interest. He mailed the "corrected" K-1 to the home of Fred Beacher. In the

23

1994 tax return, the K-1s indicated that Fred had a 66.667% interest with net income in the sum of $1,814.17, and Brenda had a 33.333% interest with net income in the sum of $907.28. (Dft's Ex. F).

However, after 1994, the corporation reported a different BBE stock ownership. In the 1995 tax return, it was reported that Fred Beacher had a 100% interest with net income of $7,795.35. Helfeld explained the circumstances surrounding this change wherein Brenda apparently lost her stock in the corporation.

BY MR. HOPKINS:

Q.     Mr. Helfeld, the circumstances surrounding the 1995 return reflecting something different regarding the K-1s than either the '93 or the '94 return, would you tell the Court, please, the circumstances leading up to that?

A.     I received a phone call from Fred Beacher. I was at my office. It was during tax season. Harry, the tax return is wrong.

       I said, why?

       He said, I own 100 percent of the building.

       At that time I said, okay, Fred, I'll make the change.

       I hung up. I did nothing at that point.

       I went to his office - - that's my recollection - - and it bothered me.

       Fred, what happened? Where is the documentation? Where are the checks?

       And I'll have to get up to show you, your Honor.

       This was his answer (indicating): Duh. And that's all I got.

Q.     You dealt with him for many, many years, "him" meaning Dr. Fred Beacher?

               THE COURT:          Sorry. He made this gesture?

| | |
|---|---|
| THE WITNESS: | Pardon? |
| THE COURT: | He showed a gesture? |
| THE WITNESS: | He went like this (indicating): Duh. |
| THE COURT: | What does that mean? |
| THE WITNESS: | I felt it meant, dummy, I paid cash. |
| MR. HASPEL: | Obejction. Move to strike. |
| THE COURT: | Sustained. |
| MR. HASPEL: | Move to strike it, your Honor. |
| THE COURT: | Yes, strike it out. |

BY MR. HOPKINS:

Q.     Have you now told us the sum and substance of the conversation between you and Dr. Fred Beacher at that time with regard to the 1995 K-1s?

A.     Yes.

Tr. at 663-665.

Helfeld testified that after 1995, "It continued to be 100 percent ownership in the name of Fred Beacher." Tr. at 665. From 1995 through 2003, he never heard from Fred or Brenda. Every year after 1994, the BBE corporate return showed 100% ownership in Fred Beacher. From 1995 to 2003, after a loss in one year, BBE had net profits of approximately $51,000. Helfeld also explained that the 1993 return which incorrectly reported the Fred Beacher stock interest at 55%, was corrected.

Helfeld questioned Fred as to why he was sending BBE related information and returns to his brother if he no longer had any interest in the corporation. Fred responded that he looked

25

upon Robert as his "financial guru" and looked to him with regard to building construction problems. Helfeld testified that he did the negotiation for the sale of the BBE building. Also, the sum of $29,400 from the Estate of Fred Beacher is being held in escrow by the plaintiff's attorney, Joseph J. Haspel. After Fred's death, Helfeld received the sum of $9,000 in cash from Robert Beacher who took it from Fred's safe. This money was deposited in the estate bank account.

On cross-examination, it was revealed that Fred's two children are the beneficiaries under his will, and that both are seeking to remove Helfeld as the executor. Robert Beacher is the alternate executor. Fred's will stated, in part: "My office building at 116-22 Metropolitan Avenue, Kew Gardens, Queens, New York, shall also be placed in a trust for the benefit of my son, Jeffrey Beacher . . . The decision as to the sale of the building, sale of the practice and/or amount of rental to charge shall be decided by my accountant, attorney and friend, Harry Helfeld, who, if he feels necessary, may consult with my brother, Robert L. Beacher." Tr. at 717.

In 1995, Fred Beacher told Helfeld that he now had 100 percent of the shares of BBE stock. In fact, all of the information obtained by Helfeld for the preparation of the tax returns regarding BBE come from Fred Beacher. Significantly, Helfeld never saw any indicia of a change in the stock ownership of the BBE corporation containing a signature of Brenda or Robert Beacher or any indicia of a transfer of the BBE shares from Brenda to Fred.

> Q.    Have you ever seen any indicia of a transfer from Brenda Beacher to Fred Beacher - - of a transfer from Brenda Beacher to Fred Beacher of BBE shares which was generated by Brenda Beacher and/or Robert Beacher?
>
> A.    I never saw any shares.
>
> Q.    Did you ever see any indicia of change of ownership of BBE Corporation

provided with a signature of Brenda Beacher or Robert Beacher?

A.      No.

                    *    *    *    *    *

Q.      In reviewing those checks, do you recall ever seeing any check to Brenda Beacher
        for any purpose whatsoever?

A.      I do not recall.

Q.      And that would include any reimbursement for capital expenses; is that correct?

A.      I do not recall any checks at all.

Q.      And did you ever see any payment to Robert Beacher from that account?

A.      I do not recall that, sir.

Tr. at 737, 753.

## IV.  DISCUSSION

### A.  As to the Plaintiff's Motion to Amend the Complaint

The complaint contains a single cause of action against the Estate of Fred M. Beacher

seeking a constructive trust.  The other cause of action pleaded in the complaint was previously

discontinued with prejudice, by stipulation.  At the conclusion of the plaintiff's case, her counsel

made a motion to conform the pleadings to the proof.  In effect, plaintiff's counsel sought to add

a cause of action in the nature of a declaratory judgment.  At that time, he explained the nature of

his additional cause of action:

> MR. HASPEL:          At the outset of this case, I initially, having reviewed these famous
>                      K-1s, saw that there was what appears to be legal ownership in
>                      Fred Beacher.  So we pleaded constructive trust, essentially
>                      arguing equitable ownership as to Brenda and Fred Beacher.
>
>                      Having gone through this trial, I think it is within the Court's

province to determine that the K-1s do not establish legal ownership.

That being said, I think it is within the province of the Court to say that what we have here is an action seeking a declaration, since what we do know is that at some point in time there was ownership and at some point in time there was no ownership.

And separate from the elements of constructive trust, we don't have to - - we can simply go straight to the question as to whether there was ever a transfer, because the only thing that the defendants have shown was that their K-1s were filed by Fred Beacher in the nature of BBE. That's what defendants have shown.

They have not shown any consideration. They have not shown any element that there was ever a transfer to Fred Beacher.

That being said, I may have been caught up in a mistake at the time of pleading in recognizing a K-1 as demonstrative of legal ownership. And there's an issue of law whether that is demonstrative of legal ownership.

If it is demonstrative of legal ownership, we're in the nature of a constructive trust. If it is not demonstrative of legal ownership, we don't have to get to constructive trust. We can simply have the Court declare there was never a transfer.

Tr. at 562, 563.

At that time, the Court reserved decision on the plaintiff's motion to conform the pleadings to the proof, which was, in effect, a motion to amend the complaint to add another cause of action for a declaratory judgment. At the end of the entire case, counsel for the plaintiff renewed his motion to conform the pleadings to the proof. In his motion he repeated the plaintiff's contention that "we may never have to get to the issue of constructive trust, because there may have not been a legal transfer." Tr. at 767.

Federal Rules of Civil Procedure 15(b) governs amendments made during or after trial,

and provides as follows:

**(b)     Amendments During and After Trial.**

> **(1)     Based on an Objection at Trial.**  If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended.  The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.  The court may grant a continuance to enable the objecting party to meet the evidence.

> **(2)     For Issues Tried by Consent.**  When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue.

The key issues to consider when deciding whether to permit an amendment during or after trial is (1) whether the defendant would be prejudiced, namely, whether the defendant had a full and fair opportunity to defend against the new cause of action asserted, and (2) whether he could offer any additional evidence if the case were to be retried adding the declaratory judgment cause of action.  See United States v. Certain Real Property, 945 F.2d 1252, 1258 (2d Cir. 1991); Royal American Managers Inc. v. IRC Holding Corp., 885 F.2d 1011, 1017 (2d Cir. 1989).

The plaintiff seeks to amend the complaint to add a cause of action seeking a judicial declaration that she is the owner of fifty percent of the shares of stock in the B.B.E. Realty Corporation.  The thrust of the plaintiff's request is that the constructive trust cause of action would apply if there was a transfer of the plaintiff's share to the decedent, and only under that fact scenario would a constructive trust cause of action be viable.  According to the plaintiff there

29

was no evidence of a transfer of Brenda's stock to the decedent, so there would be no reason to request that a constructive trust be imposed on the party who claims to be the sole owner of the stock.

A fundamental rule in Federal Court is the right to amend the complaint if there is no prejudice to the opposing party. The amendment at or after trial is also permissible if there is no prejudice to the opposing party and that party had had an opportunity during the trial to present its defense to the proposed cause of action on the merits. The rule is stated in Fisher v. Vassar College, 70 F.3d 1420, 1449 (2d Dept. 1995):

> Fed.R.Civ.P. 15(b) allows a party to amend its pleadings to conform to the proof received into evidence. The decision of whether to allow such an amendment is left to the discretion of the district court judge. See Grand Light & Supply Co., Inc. v. Honeywell, Inc., 771 F.2d 672, 680 (2d Cir. 1985). When such a motion is made after the start of trial, however, it should be granted only "if the party against whom the amendment is offered will not be prejudiced by the amendment". Hillburn by Hillburn v. Maher, 795 F.2d 252, 264 (2d Cir. 1986), cert. denied, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 859 (1987). Ordinarily, the assertion of a new claim for liability on the last day of trial will be prejudicial. Nevertheless, absent an objection or a request for a continuance, it was not an abuse of discretion for the district court's decision to allow the amendment.

While the Fisher decision stated that the assertion of a new claim for liability on the last day of the trial will be prejudicial, that was not the situation in this case. The Court finds that all of the very same evidence in this trial was applicable to both the constructive trust and the declaratory judgment causes of action. The same proof and facts on both sides adduced during the trial are applicable to both causes of action. The Court cannot visualize any evidence that could have been introduced if the amendment was made prior to the trial. Therefore, there was

no prejudice to the defendant in permitting the plaintiff to interpose this new cause of action during or after the trial. Cf. Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 94 (2d Cir. 2000) ("Generally, introducing new claims for liability on the last day of trial will prejudice the defendant."). Here, all the proof was presented as to both causes of action. Therefore, the Court finds that it would be abuse of discretion to deny the plaintiff's motion to add the declaratory judgment cause of action. The record reveals that the defendant was fully apprised of all the facts and evidence introduced and, in addition, fully advised of the theory of the declaratory judgment. The defendant was offered every opportunity to refute the facts and evidence adduced in support of the declaratory judgment based on the plaintiff's contention that there never was a transfer of Brenda's share of stock in the BBE corporation.

In this regard the Court is also guided by the rule set forth in Quarantino v. Tiffany & Co., 71 F.3d 58, 66 (2d Cir. 1995), as follows:

> Again, leave to file a supplemental pleading should be freely permitted when the supplemental facts connect it to the original pleading. See Bornholdt v. Brady, 869 F.2d 57, 68 (2d Cir. 1989); LaSalvia v. United Dairymen, 804 F.2d 1113, 1119 (9th Cir. 1986), cert. denied, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987). Leave is normally granted, especially when the opposing party is not prejudiced by the supplemental pleading. See Bornholdt, 869 F.2d at 68; LaSalvia, 804 F.2d at 1119.
>
> In the instant case plaintiff offered factual support related to the original complaint. Were the motion to be granted, no prejudice to defendants is apparent.
>
> *  *  *  *  *
>
> Given our earlier discussion demonstrating the factual nature of that conclusion, it was an abuse of the district court's discretion for it to deny plaintiff's motion for leave to file a supplemental complaint, alleging an additional cause of action for unlawful retaliation.

As in <u>Quarantino</u>, the facts involving the declaratory judgment cause to be added "connect it to the original pleading."  In fact, the facts connecting both causes of action are the same.  Also, there is no prejudice to the defendant.

Accordingly, the plaintiff's motion to conform the pleading to the proof in order to amend the complaint to add a second cause of action sounding in a request for a declaratory judgment stating that Brenda Beacher is the owner of fifty percent of the BBE stock, is granted.

**B.  <u>As to the Declaratory Judgment Cause of Action</u>**

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy," a federal court "may declare the rights . . . of any interested party seeking such declaration."  28 U.S.C. §2201(a).  Courts in the Second Circuit apply a two-pronged test to determine whether an actual controversy exists in a declaratory judgment action.  <u>Starter Corp. v. Converse, Inc.</u>, 84 F.3d 592, 595 (2d Cir. 1996); <u>see</u> <u>Matthew Bender & Co., Inc. v. West Publ'g Co.</u>, No. 94 Civ. 0589, 95 Civ. 4496, 1996 WL 223917, at *1 (S.D.N.Y. May 2, 1996).  "First, the defendant's conduct must have 'created a real and reasonable apprehension of liability on the part of the plaintiff.'"  <u>Ritz Hotel, Ltd. v. Shen Mfg. Co.</u>, 384 F. Supp. 2d 678, 682 (S.D.N.Y. 2005) (quoting <u>Starter</u>, 84 F.3d at 595).  "Second, the plaintiff must have 'engaged in a course of conduct which has brought it into adversarial conflict with the defendant.'"  <u>Id.</u>  (quoting <u>Starter</u>, 84 F.3d at 595).  "Both elements must exist at the time the declaratory judgment action is filed."  <u>Id.</u> (citations omitted).  If the Court finds that an actual controversy exists, then it may exercise declaratory judgment jurisdiction.  <u>Starter</u>, 84 F.3d at 494.  Applying the <u>Starter</u> test to the facts of this case, the Court finds that an actual controversy exists.

First, the defendant's conduct in denying that Brenda has any stockholder interest in the BBE corporation has created an untenable position for her. In her view, she has a 50% interest in this corporation and yet, without action on her part, her interest will be nullified. Second, her demand for the 50% stock interest has brought her "into adversarial conflict with the defendant."

In a recent decision, the Second Circuit clearly explained the propriety of issuing a declaratory judgment. In Peconic Baykeeper Inc. v. Suffolk County, 600 F.3d 180, 187 (2d Cir. 2010) it set forth the following rule.

> The Declaratory Judgment Act confers on federal courts "unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995); 28 U.S.C. § 2201(a) ("Any court may declare the rights and other legal relations of any interested party . . . .") (emphasis added). "The propriety of issuing a declaratory judgment may depend upon equitable considerations and is also informed by the teachings and experience concerning the functions and extent of federal judicial power." Green v. Mansour, 474 U.S. 64, 72 (1985) (citation and quotation marks omitted). Among the relevant considerations in exercising discretion is "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved." Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).

Here, there is no doubt that a declaratory judgment will serve a useful purpose in clarifying or settling the legal issues involved. Also, the Court finds that an actual controversy exists. Therefore, the Court finds that this is a case of actual controversy in which the Court may declare the rights of the interested party seeking such a declaration; in this case the apparent sole avenue for the plaintiff Brenda Beacher to seek her right to the stock ownership.

In addition, the Court finds that a constructive trust, the cause of action initially pleaded in the complaint, cannot resolve the controversy between the plaintiff Brenda Beacher and the

defendant the Estate of Fred M. Beacher.  As thoroughly discussed in Judge Platt's September 18, 2008 decision, there are four requirements for the imposition of a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in relevance on that promise; and (4) unjust enrichment.  The evidence adduced at the trial revealed that there was no proof of any transfer by Brenda to Fred.  That key element of a constructive trust is missing.  This is another indication that the Court should exercise its discretion to entertain the plaintiff's claim in the nature of a declaratory judgment.

      1.  **The Proof at the Trial**

      The unequivocal and, in reality, the uncontested proof in this case is there is no evidence that Brenda transferred her shares of stock in the BBE corporation to Fred Beacher.  The only evidence raised by the Estate, relevant to this issue is that for a number of years, the BBE corporation tax return form K-1 stated that Fred Beacher had a 100% interest in the corporation.  However, the Court finds that tax returns in general, and form  K-1s in particular, have equivocal evidentiary value in the absence of supporting records.  Ehrensperger v. Commissioner, T.C.M. 1994-279, 67 T.C.M. (CCH) 3106, 3108, 1994 W.L. 269153 (T.C. 1994) (finding Schedule K-1s insufficient to meet taxpayers burden to establish his share of liabilities in partnerships).

      With regard to the disturbing attempt by Robert Beacher to impose a false will, the Court questioned defense counsel about the possible consequence of this bad act.  In response, counsel for the defendants stated that this false will would place Robert Beacher as the executor of the Estate of Fred M. Beacher and he "would ultimately pass judgment . . . on the bona fides of the claim of his wife, Brenda Beacher."  Tr. at 394.  Also, according to defendant's counsel, "it is a reflection of his character of truthfulness . . ."  Tr. at 396.  The Court finds that this bad act

reflects on the character of Robert Beacher, but does not affect the Court's ruling in this case.

Here, the facts are clear and undisputed from the formation of BBE in 1986 to the year 1994. In or about 1986, Fred and his brother Robert and Melvin Epstein formed BBE. At the time of the formation each owned 33 1/3% of the stock. No stock certificates were ever issued and no stockholder agreement was consummated. In fact, the corporate books and records with regard to stock ownership are practically blank. Also, there is no dispute that, in or about 1991 Robert Beacher transferred his 33 1/3% ownership of the stock in BBE to his wife Brenda. In addition, it is unrefuted that on June 1, 1993, BBE bought Epstein's 33 1/3% share of the corporate stock. This is set forth in the only written agreement involving the parties and the corporation, ("The Stock Purchase Agreement"). (Pltf's Ex. 1). In that agreement, Epstein sold his stock to BBE for the sum of $15,000. He did not sell the stock to Fred.

Therefore, as of June 1, 1993, the effective date of the Epstein sale of stock, the remaining issued and outstanding shares of stock were owned by Fred and Brenda in equal shares, namely 50% each. As the Court ultimately finds, that division of the corporate stock of BBE continued to the present date. The BBE tax return for 1993 and its K-1 indicated that Fred owned 55% and Brenda owned 45%. According to accountant Helfeld, this was an error, and an amended K-1 was issued showing an allocation of two-thirds to Fred and one-third to Brenda.

At the trial, Helfeld produced a handwritten letter from Fred, which reads as follows:

3/17/94

Dear Harry:

I am returning the tax returns to you.

re:  BBE:

      (1)  my partners are     Brenda Beacher
                            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
                            640 Barnard Av.
                            Woodmere, NY 11598

                            Melvin Epstein
                            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
                            35-39 168 St.
                            Flushing, NY 11358

      (2)  I bought Mel's 1/3 116-22 Met. Ave.
           Therefore, the business loss listed on the K-1 for Brenda and
           for me is wrong.  Please redo with the correct #'s.

      (3)  Several places have been stamped 'copy'.  This is wrong.

      (3)  The handwriting in several places is terrible.  Numbers and names
           are difficult to make out and I know what they should be.

re: Personal: If the K1 is wrong, so is the rest of my #'s.

                                            Fred

(Dft's Ex. D).

      The Court notes that the statement in the Fred Beacher letter that "I bought Mel's 1/3 of 116-22 Met. Ave." is contrary to the terms of the Stock Purchase Agreement, which states that BBE purchased the Epstein stock.  This agreement was signed by Fred twice; once on behalf of the corporation and then individually.  The Court assumes that by signing the agreement, Fred approved of its terms; namely, a sale by Epstein to the corporation.

In the years after 1993, when Epstein was no longer a stockholder, the 1994 tax return indicated a 66 2/3% ownership by Fred and a 33 1/3% ownership by Brenda. However, starting in 1995 and continuing to 2003, the tax returns prepared by Helfeld indicated a 100% stock ownership by Fred. Helfeld testified that he sent the tax returns to Fred and that he was aware that Fred was sending the BBE returns to Brenda and Robert after the returns indicated that Fred was the sole owner of BBE. The Court notes that the admitted errors and contradictions in the K-1s further support the finding that the K-1s in this case are unreliable evidence.

What was the legal effect of the Fred Beacher K-1 tax returns indicating a 100% stock ownership in BBE by Fred, which returns were sent to Brenda and Robert? These tax returns are insufficient to establish Fred's ownership of BBE, and, at most, constitute an unsubstantiated claim by Fred. See Weiner v. United States, 255 F. Supp. 2d 663, 666-67 (S.D. Texas 2002) ("The Court finds that the AMCOR Schedule K-1 may be some evidence as to how long after the fact the general parties decided to allocate partner's income, but is not proof of the legal accuracy of that post hoc allocation."); Id. at 667 N.11. ("The partnership's tax records are evidence of what was actually reported to the IRS. However, the Court does not consider them meaningful evidence on the ultimate question of whether, and when, the legal prerequisites for partnership of AMCOR were met.") Also, as stated in Ehrensperger, the rule as to the legal effect of a tax return was set forth:

> Petitioner did not present any substantiating records but only provided the returns for his spouse and him, a Form 1065 for A & E, and Schedules K-1 for each of the partnerships. The entries on the returns of petitioner and his spouse are not evidence to establish the truth of the matters set forth therein but merely a statement of their claim. See Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, supra at 837.

Ehrensperger, T.C. M. 1994-279; 67 T.C.M. (CCH) 3106, 1994 WL 269153, at *5; see also Roberts v. Commissioner, 62 T.C. 834, 837; 1974 U.S. Tax Ct. (T.C. 1974) (". . . [m]erely signing a tax return under penalty of perjury does not establish the facts contained therein . . . The tax return signed under penalties of perjury is merely a statement of petitioner's claim . . . it is not presumed to be correct.") (Internal citations omitted).

In this case, there is no dispute that the BBE corporation was formed in 1986 with three stockholders, Fred, Robert and Epstein. Each owned 33 1/3% of the stock. In addition, there is no dispute that in April 1991 Robert transferred his shares of stock to his wife Brenda. The parties also agree that in 1993 Epstein sold his stock to BBE. The Court finds that the sale resulted in Fred and Brenda owning all of the BBE stock, equally. At that juncture, with reasonable certainty, Fred and Brenda each owned 50% of the BBE stock. This case really revolves around the issue of what happened to the 50% stock interest of Brenda Beacher. In short language, nothing happened to her interest.

Unequivocally, the proof revealed that there was no written agreement evidencing a transfer of Brenda's stock. There were no stock certificates issued; no less any endorsed by Brenda. There is no evidence of any payment to her for the stock; nor is there evidence of a gift by Brenda. The only indication of any change in the ownership of Brenda's stock are the corporate returns prepared by Harry Helfeld, who was Fred's accountant and is the executor named in his will. The Court therefore finds that the shares of stock of Brenda Beacher, in the amount of 50% of the issued shares, were never sold or transferred to Fred Beacher.

Accordingly, the Court approves a declaration that the plaintiff Brenda Beacher is the present record owner of 50% of the outstanding shares of the BBE corporation.

**C.** <u>**As to the Constructive Trust Cause of Action**</u>

As previously stated, the elements in a constructive trust cause of action are: (1) a confidential or fiduciary relationship; (2) a promise; (3) a transfer in reliance on the promise; and (4) unjust enrichment.  <u>United States v. Coluccio</u>, 51 F.3d 337, 340 (2d Cir. 1995); <u>see</u> <u>also</u> <u>In re First Century Financial Corp.</u>, 377 F.3d 209 (2d Cir. 2004).

The Court has already ruled, in this decision, that there was no transfer of stock from Robert or Brenda to Fred.  The evidence is clear that Brenda retained her 50% share of the stock of BBE and never transferred it to Fred.  Therefore, there could be no constructive trust cause of action derived from the facts already found by the Court.  Accordingly, the plaintiff's cause of action for a constructive trust is dismissed.

**D.** <u>**As to the Defendant's Contentions and Defenses**</u>

     **1.** <u>**The Burden of Proof**</u>

In his Post-Trial Memorandum of Law, defendant's counsel contends that "since the plaintiff claims she has been 'defrauded' by the Estate's claim that she has no interest in BBE, that standard is 'clear and convincing' evidence."  (Defendant's Post-Trial Memorandum at 12). The authority for this contention is the New York Pattern Jury Instructions § 1.64.  However, that charge "is for use in those cases where the issue is fraud and related cases."  Here the plaintiff does not request a finding of fraud nor does she seek damages.  The case started and concluded as an action seeking ultimate declaratory relief with regard to Brenda's ownership of BBE stock. Nor is the Noseworthy lesser burden of proof standard applicable to this equitable cause of action.  The proper burden of proof in this civil action seeking equitable relief is by a "preponderance of the credible evidence."

**2. As to the Defense of Laches**

The defendant contends that as of 1995 the decedent Fred Beacher "acted in every way imaginable as though he alone owned BBE Realty." Each K-1 during the period of 1995 to 2003 recited that Fred alone had 100% of the stock ownership. These BBE tax returns and K-1s were sent to Robert Beacher every year. Further, with the death of Fred Beacher, the Estate "lost the only witness who could have and would have disputed Mr. Robert Beacher's testimony of an 'oral arrangement.'" In addition, the defendant contends that the Estate paid the taxes on the approximately $51,000 net income for the 1995-2003 period, which cannot be recovered. Therefore, the defendant asserts that this lawsuit should have been initiated in 1995/1996. To have waited ten (10) years is inexcusable. (Defendant's Post-Trial Memorandum at 22). In response, the plaintiff contends that "there was no lack of diligence by Brenda Beacher." (Plaintiff's Reply Memorandum at 11).

The defense of laches is, a "question primarily addressed to the discretion of the trial court which must consider the equities of the parties." Gardner v. Panoma R.R. Co., 342 U.S. 29, 30, 31, 72 Sup. Ct. 12, 13, 96 L.Ed. 31 (1951) (per curiam). "[Laches] is an equitable defense that bars a plaintiff's equitable claim when he [or she] is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir. 1988) (Internal quotations and citations omitted). To prove laches, the defense must establish: (1) an unreasonable delay by the plaintiff by bringing suit; and (2) prejudice to the defendant. See Perez v. Danbury Hospital, 347 F.3d 419, 426 (2d Cir. 2003); Merill Lynch Inv. Managers v. Optibase Ltd., 337 F.3d 125, 132 (2d Cir. 2003).

Here, the defendant contends that since 1995, Fred Beacher acted as if he alone owned

BBE Realty.  He alone was listed on the K-1s for the period of 1995 to 2003 as the owner of

BBE.  The plaintiff's husband received the BBE tax returns during this period which stated that

Fred alone had 100% stock ownership.  The Court notes that defendant's counsel refers to Robert

as the plaintiff's "husband/agent."  The defendant goes on to assert that with the death of Fred

Beacher, the Estate lost the only witness who could have and would have disputed Robert

Beacher's testimony of an "oral arrangement."  (Defendant's Post-Trial Memorandum at 22).

The Court finds that the defendant failed to establish the first element of the laches

defense; namely, an unreasonable delay by the plaintiff Brenda Beacher in bringing suit.

Initially, there is no proof that the plaintiff Brenda Beacher knew that Fred Beacher claimed to

own 100% of the BBE stock.  The only evidence to support such a finding is the K-1s in Fred's

income tax returns which, from 1995, indicate a 100% ownership of the BBE stock.  First, Fred's

personal income tax returns were sent to his brother Robert every year.  The Court cannot discern

why this was done.  Why would Fred, the self-proclaimed 100% stockholder send his tax returns,

including the K-1s involving the BBE stock holdings to his brother Robert, who had no interest

in BBE?  In any event, Robert testified that although he received the returns, he never reviewed

them and did not know of the 100% stock assertion by his brother.  Second, there is no evidence

that the plaintiff in this case, Brenda Beacher ever knew of the claim by Fred of 100% stock

ownership.  She, herself, personally never received Fred's tax returns.  Apparently, the first she

knew about Fred's ownership claim was after his death.  Therefore, the Court finds the defendant

failed to prove that Brenda Beacher is guilty of unreasonable and inequitable delay in this case.

With regard to prejudice, the second element of laches, as a result of his death, Fred

Beacher is no longer available as a witness.  However, there was other evidence adduced at the

trial with regard to Fred's likely testimony as to Brenda's stock ownership.

There was testimony at the trial of a conversation between accountant Jeffrey Goldstein and Fred Beacher in August or September 2003.

Q.   Now, did you discuss the ownership of BBE with Fred Beacher?

A.   That came up in the conversation.

Q.   What was that?

A.   It was more that he could state to me that he and Brenda Beacher were shareholders in BBE.

Q.   And that was in what year?

A.   2003.

Q.   Was there any discussion of the percentage of the shareholder?

A.   They said equal shareholders.

*   *   *   *   *

Q.   Sir, did you see his personal returns at that time, at that 2003 meeting, referring to Dr. Fred Beacher?

A.   Yes.

Q.   So when you saw his personal returns at that time, was that for the year 2002?

A.   Yes.

Q.   Would it therefore be fair to say you saw in those returns that he reflected a 100 percent interest in BBE?

A.   No.

Q.   You didn't see the BBE returns at that time, though, correct?

A.   No, I did not.

Q. What I'm trying to understand, Mr. Goldstein, is the context of the statement you attribute to Dr. Fred Beacher.

He just volunteered to comment to you spontaneously?

A. Yes.

THE COURT: I'm sorry, I didn't hear you.

MR. HOPKINS: He just volunteered to you the comment spontaneously?

THE WITNESS: Yes.

BY MR. HOPKINS:

Q. So it wasn't in response to a questions of yours, correct?

A. No.

Q. And it wasn't in any kind of context or explanation, was it?

A. No.

THE COURT: What was the comment?

THE WITNESS: That - -

MR. HOPKINS: I'm referring to the comment - -

THE COURT: Excuse me. What was the comment?

THE WITNESS: The comment that BBE was equally owned between Fred Beacher and Brenda Beacher.

Tr. at 595, 535, 536.

More importantly, his accountant and the executor of his estate Harry Helfeld testified as

to the circumstances in which Brenda allegedly lost her stock in the corporation. Helfeld had

questioned Fred Beacher about the "wrong" tax return listing him as the 100% stock owner.

Again, here is the key testimony as to Fred's explanation for his alleged 100% ownership.

BY MR. HOPKINS:

Q.      Mr. Helfeld, the circumstances surrounding the 1995 return reflecting something different regarding the K-1s than either the '93 or the '94 return, would you tell the Court, please, the circumstances leading up to that?

A.      I received a phone call from Fred Beacher.  I was at my office.  It was during tax season.  Harry, the tax return is wrong.

I said, why?

He said, I own 100 percent of the building.

At that time I said, okay, Fred, I'll make the change.

I hung up.  I did nothing at that point.

I went to his office - - that's my recollection - - and it bothered me.

Fred, what happened?  Where is the documentation?  Where are the checks?

And I'll have to get up to show you, your Honor.

This was his answer (indicating):  Duh.  And that's all I got.

Q.      You dealt with him for many, many years, "him" meaning Dr. Fred Beacher?

            THE COURT:        Sorry.  He made this gesture?

            THE WITNESS:     Pardon?

            THE COURT:        He showed a gesture?

            THE WITNESS:     He went like this (indicating):  Duh.

                    *    *    *    *    *

BY MR. HOPKINS:

Q.      Have you now told us the sum and substance of the conversation between you and Dr. Fred Beacher at that time with regard to the 1995 K-1s?

A.    Yes.

Tr. at 663-665.

After a review of the testimony, as to the defense of laches, the Court finds that any

prejudice caused by the death of Fred Beacher, was ameliorated by the event related by

accountant Jeffrey Goldstein and, even more so by the revealing testimony of Harry Helfeld, the

executor for the defendant, the estate of Fred M. Beacher.

Accordingly, the Court finds that the defendant has failed to establish the defense of

laches.

### 3. <u>As to the Defense of Unclean Hands</u>

The defendant contends that the doctrine of "unclean hands" should be imposed with

regard to the constructive trust cause of action.  The Court assumes that the defendant also seeks

to apply this same doctrine to the alleged inequitable conduct of Robert Beacher, in the

declaratory judgment cause of action.  Apparently, the defendant contends that Robert Beacher's

conduct transferring his stock ownership to his wife Brenda was "to defraud the government

from monies (i.e., taxes) he would have otherwise been obligated to pay . . ."  The defendant

further alleges that this scheme to defraud lasted from 1995 until the death of Fred Beacher,

when Robert attempted to submit a bogus will and testament for probate.  (Defendant's Post-

Trial Memorandum at 22, 23).

There is authority that Courts may deny relief to litigants guilty of unconscionable

conduct in relation to the matter in which relief is sought.  <u>See</u> <u>e.g.</u> <u>Precision Instrument Mfg. Co.</u>

<u>v. Automotive Maintenance Machinery Co.</u>, 324 U.S. 806, 814-816, 65 Sup. Ct. 993; 89 L. Ed.

1381 (1945); <u>Specialty Minerals, Inc. v. Pluess-Stanfer AG</u>, 395 F. Supp. 2d 109, 112 (S.D.N.Y.

2005).  As stated in <u>Kopsides v. Krokos</u>, 294 A.D.2d 406, 742 N.Y.S.2d 342, 344 (2d Dep't 2002):

> "The doctrine of unclean hands applies when the complaining party shows that the offending party is "guilty of immoral, unconscionable conduct and even then only 'when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct'" (<u>National Distillers & Chem. Corp. v. Seyopp Corp.</u>, 17 N.Y.2d 12, 15-16, 267 N.Y.S.2d 193, 214 N.E.2d 361; <u>see also</u> <u>Nicolaides v. Nicolaides</u>, 173 A.D.2d 448, 569 N.Y.S.2d 968)."

In this regard, see also <u>Jara v. Strong Steel Door Inc.</u>, 58 A.D.2d 600, 871 N.Y.S.2d 363, 365 (2d Dept. 2009) ("Here, Strong Steel Door was not injured by Huerta's production of false documentation . . ."); <u>Columbo v. Columbo</u>, 50 A.D.2d 617, 856 N.Y.S.2d 159, 160 (2d Dept. 2008) ("Here the plaintiff's alleged immoral conduct in seeking to purchase the premises for his girlfriend was directed at his wife, who is not a party to this action, and thus neither directly related to the subject matter in litigation nor directly injured the appellants . . .").

In this case, apparently, the defendant seeks to deprive Brenda of her stock ownership rights because (1) Robert attempted to defraud the government of taxes when he transferred his stock to Brenda, and (2) Robert attempted to file a bogus last will and testament for probate.  The Court finds that neither of these contents will support an "unclean hands" defense.  As to the transfer of Robert's stock to Brenda, allegedly to avoid paying taxes, this alleged 'fraud', if true, was not committed against the defendant but against the government and/or the state and thus, is not directly related to the subject matter at issue in this litigation; namely, the stock ownership of BBE corporation.

In addition, the defendant's claim based on the bogus unsigned will, is also not directly

related to the plaintiff's declaratory judgment cause of action at issue in this case. The unsigned will did not change any bequest in the valid will except the named executor. As such this "unconscionable conduct" is not directly related to the subject matter in litigation which is solely regarding the ownership of the stock in BBE. Accordingly, the defendant has failed to prove the defense of "unclean hands."

## V. __CONCLUSION__

The Court enters judgment in favor of the plaintiff Brenda A. Beacher declaring that she is entitled to 50% of the stock of the BBE Realty Corp. The defendant, the Estate of Fred M. Beacher, deceased, by it executor Harry Helfeld is directed to issue stock certificates dividing the outstanding stock in the BBE Realty Corp., 50% to the Estate of Fred M. Beacher, deceased, and 50% to Brenda A. Beacher, within twenty days of the date of this Order.

   **SO ORDERED.**

Dated: Central Islip, New York
       December 21, 2010


                                    _/s/ ARTHUR D.SPATT_____
                                     ARTHUR D. SPATT
                                    United States District Judge